**ROBERT S. MATHES,[1] COMMISSIONER OF THE VIRGIN ISLANDS DEPARTMENT OF PLANNING AND NATURAL RESOURCES, IN HIS CAPACITY AS TRUSTEE FOR THE NATURAL RESOURCES OF THE TERRITORY OF THE UNITED STATES VIRGIN ISLANDS, and IN HIS CAPACITY AS ASSIGNEE OF THE CLAIMS OF L'HENRI, INC.,**
**Plaintiff**
**v.**
**VULCAN MATERIALS COMPANY and THE DOW CHEMICAL COMPANY, Defendants**

Civil No. 2006-229

District Court of the Virgin Islands

St. Thomas and St. John Division

August 21, 2009

---

[1] The Complaint originally named Dean C. Plaskett ("Plaskett"), former Commissioner of the United States Virgin Islands Department of Planning and Natural Resources, as the plaintiff in this matter. Since that time, Robert S. Mathes ("Mathes") succeeded Plaskett as the Commissioner of the United States Virgin Islands Department of Planning and Natural Resources. As such, Mathes is automatically substituted for Plaskett as the plaintiff in this matter. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

856

JOHN K. DEMA, ESQ., St. Croix, USVI, *For the Plaintiff.*

GORDON C. RHEA, ESQ., Mt. Pleasant, SC, *For the Plaintiff.*

DOUGLAS C. BEACH, ESQ., CAROL ANN RICH, ESQ., St. Thomas, USVI, *For defendant Vulcan Materials Company.*

RICHARD H. HUNTER, ESQ., St. Croix, USVI, *For defendant The Dow Chemical Company.*

GÓMEZ, *Chief Judge*

## MEMORANDUM OPINION

(August 21, 2009)

Before the Court is a pleading filed by the plaintiff in this matter, Robert S. Mathes ("Mathes," or the "Commissioner"), Commissioner of the United States Virgin Islands Department of Planning and Natural Resources ("DPNR"). That pleading, styled as a "Suggestion to Dismiss," invites the Court to dismiss this matter without prejudice for lack of subject-matter jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action arises from the contamination of the Tutu Wells Aquifer (the "Aquifer"), which was, at one time, a significant source of drinking water for residents of St. Thomas, U.S. Virgin Islands. In the late 1980s, testing revealed elevated levels of certain chemicals that made the Aquifer's water unsuitable for human consumption. In 1995, the United States Environmental Protection Agency (the "EPA") put the Aquifer on the National Priorities List of severely-contaminated sites.

L'Henri, Inc. ("L'Henri") operates a dry-cleaning facility near the Aquifer. EPA studies revealed the presence of contaminants on L'Henri's property, which had impacted groundwater quality to bring it outside the range of acceptable federal drinking water standards.

859

On August 5, 1996, the EPA issued a Record of Decision, in which it set forth a strategy to clean up the Aquifer pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675. After consultations with the EPA, the DPNR approved the federal clean-up plan.[2] That clean-up plan is still underway.

In February, 2005, the Commissioner and L'Henri executed an agreement, pursuant to which L'Henri assigned to the Commissioner all claims it may have arising from the Aquifer contamination (the "Assignment"). In March, 2005, this Court entered a consent judgment in a related matter based on L'Henri's liability for damages to natural resources as a result of the Aquifer contamination, captioned as Civil No. 1998-206 (the "*In re Tutu Wells Contamination Litigation*"). The consent judgment was entered against L'Henri and in favor of the Commissioner, in the amount of $23,282,550.

In December, 2006, the Commissioner, in his capacity as trustee for the natural resources of the Territory of the Virgin Islands, and in his capacity as assignee of the claims of L'Henri, initiated this action against Vulcan Materials Company and the Dow Chemical Company (together, the "Defendants"). The Commissioner alleges that, during the course of its dry cleaning operations, L'Henri released chemicals, including tetrachloroethylene, a/k/a perchloroethylene ("PCE") into the ground above the Aquifer. He asserts that the EPA found that PCEs released from L'Henri contributed to the contamination of the Aquifer. The Commissioner alleges that the Defendants are the manufacturers and suppliers of the PCEs used by L'Henri, and that they failed to adequately warn users of the dangers posed by PCEs. He alleges that the Defendants' tortious conduct caused the contamination of the Aquifer.

Count One of the complaint asserts a claim based on negligence. Count Two is a claim for strict liability. Counts Three and Four allege causes of action for public and private nuisance. Count Five is a claim for contribution and indemnification. Count Six asserts a claim based on unjust enrichment and restitution. The complaint seeks monetary damages, including but not limited to the $23,282,550 amount of the

---

[2] CERCLA requires state participation in a federally-initiated clean-up plan. *See* 42 U.S.C. § 9621(f).

consent judgment. It invokes the Court's jurisdiction pursuant to 28 U.S.C. § 1332(a) ("Section 1332(a)").[3]

The Commissioner has filed a pleading styled as a "suggestion of dismissal," recommending that this action be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(h)(3) ("Rule 12(h)(3)").[4] He contends that the government of the Virgin Islands is not a "citizen" of a state for the purpose of establishing diversity-of-citizenship jurisdiction pursuant to Section 1332. He further contends that there is no other basis upon which to invoke this Court's jurisdiction.

The Defendants have filed an opposition, arguing in the alternative that (1) the Commissioner's claims are "inextricably tied" to CERCLA, and thus that this Court has original jurisdiction over those claims pursuant to 28 U.S.C. § 1331 ("Section 1331"), or (2) jurisdiction is appropriate in this Court because the Commissioner's claims are completely preempted by CERCLA.

A hearing on the jurisdictional issue was conducted on August 6, 2009.

## II. ANALYSIS

██ ██ It is axiomatic that a federal court may not exercise authority over a case for which it does not have subject-matter jurisdiction. FED. R. CIV. P. 12(h)(3); *Brown v. Francis,* 75 F.3d 860, 866, 33 V.I. 385 (3d Cir. 1996). Here, the parties do not dispute that this Court does not have diversity jurisdiction under Section 1332. Indeed, the United States Court of Appeals for the Third Circuit has explained that the government of the

---

[3] Section 1332(a) provides:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between —

(1) citizens of different States;
(2) citizens of a State and citizens or subjects of a foreign state;
(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

[4] Rule 12(h)(3) provides:

If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

FED. R. CIV. P. 12(h)(3).

Virgin Islands "cannot be considered a citizen for purposes of establishing diversity of citizenship jurisdiction." *Brown v. Francis*, 75 F.3d 860, 865, 33 V.I. 385 (3d Cir. 1996). Thus, there must be some other independent basis for the exercise of jurisdiction. *See Warren E. Brown Tenants' Council v. V.I. Housing Auth.*, 17 V.I. 486, 488 (D.V.I. 1980) (unpublished), *cited with approval in Gov't of the V.I. v. Sun Island Car Rentals, Inc.*, 819 F.2d 430, 432 (3d Cir. 1987). The Defendants contend that, even if this Court lacks diversity jurisdiction, the Commissioner's complaint in this case arises under federal law, and thus supports federal question jurisdiction under Section 1331.[5]

■ To determine whether a case arises under federal law, courts must look to the plaintiff's well-pleaded complaint. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 389 (3d Cir. 2002). "Under the well-pleaded complaint rule, there can be no removal on the basis of a federal question unless the federal law under which the claim arises is a direct and essential element of the plaintiffs case." *In re Community Bank of Northern Virginia*, 418 F.3d 277, 293-94 (3d Cir. 2005). A case arises under federal law if a right or immunity created by the Constitution or laws of the United States is an essential element of the plaintiff's cause of action. *Christianson v. Colt Ind. Operating Corp.*, 486 U.S. 800, 809, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988). For jurisdictional purposes, the Court does not concern itself with the question whether a plaintiff will ultimately be successful on the merits of his claims. *See id.* (citing *Bell v. Hood*, 327 U.S. 678, 681-82, 66 S. Ct. 773, 90 L. Ed. 939 (1946)).

■ Here, the complaint, on its face, asserts only territorial-law claims. However, the Court may nevertheless have federal question jurisdiction over the Commissioner's claims. The Supreme Court of the United States has developed two exceptions to the "well-pleaded complaint" rule: the complete preemption doctrine, *see Allstate Ins. Co. v. 65 Sec. Plan*, 879 F.2d 90, 93 (3d Cir. 1989), and the substantial federal question doctrine, *see Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005).

---

[5] Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

## A. Complete Preemption

■ Under the doctrine of complete preemption, when a purportedly state-law claim comes within the scope of an exclusively federal cause of action, it necessarily arises under federal law, and is completely preempted. *Scheibler v. Highmark Blue Shield*, 243 Fed. Appx. 691, 693 (3d Cir. 2007) (unpublished). The doctrine of complete preemption applies only when two circumstances are present: (1) when the enforcement provisions of a federal statute create a federal cause of action vindicating the same interest that the plaintiff's cause of action seeks to vindicate; and (2) when there is affirmative evidence that Congress intended the federal cause of action to be exclusive. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9,123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003); *Allstate Ins. Co. v. 65 Sec. Plan*, 879 F.2d 90, 93 (3d Cir. 1989) (citing *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie Railroad Co.*, 858 F.2d 936, 942-43 (3d Cir. 1988)). In the absence of explicit direction from Congress, courts should be reluctant to find that the "extraordinary pre-emptive power necessary for the complete preemption doctrine" applies. *Railway Labor Executives Ass'n*, 879 F.2d at 940-41 (quotations omitted).

Therefore, the Court must determine whether CERCLA provides a federal cause of action vindicating the same interests sought to be vindicated by the claims asserted against the Defendants in the Commissioner's complaint.

### 1. Counts One through Five

Counts One through Four of the Commissioner's complaint, though asserting different theories of liability, all seek to recover damages for injuries caused to the natural resources of the Virgin Islands. Count Five seeks to hold the Defendants responsible for their fair share of the costs associated with the contamination. Specifically, in Count Five, the Commissioner seeks contribution and indemnity for costs stemming from the consent judgment against L'Henri in the *In re Tutu Wells Contamination Litigation.*

■ CERCLA provides a comprehensive mechanism for the cleanup of hazardous waste and primarily aims to enable the efficient cleanup of hazardous waste and ensure that cleanup costs are borne by responsible parties. *See Burlington Northern and Santa Fe Ry. Co. v. United States*,

___ U.S. ___, 129 S. Ct. 1870, 1874, 173 L. Ed. 2d 812 (2009). Section 113(b) of CERCLA provides that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter[.]" 42 U.S.C. § 9613(b).

CERCLA imposes liability for costs of remedial action as well as for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss. . . ." *Id.* at 9607(a)(4)(C). CERCLA also provides a federal cause of action for contribution claims against parties who are liable or potentially liable under the statute. *See id.* at § 9613(f)(1).[6] Significantly, only "covered persons" as defined by the statute, commonly referred to as potentially responsible parties ("PRPs"), are subject to liability for cleanup costs, damages, or contribution under CERCLA. *See id.* at §§ 9607(a), 9613(f)(1).

Title 42 U.S.C. § 9607(a) ("Section 9607(a)") sets forth the following categories of PRPs under CERCLA:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or

---

[6] Section 113(f)(1) provides:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1).

sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C. § 9607(a).

Here, the Commissioner does not allege that the Defendants owned or operated any facilities or vessels. The Commissioner also does not allege that the Defendants "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances." There is also no allegation that the Defendants "accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites[.]" Rather, the Commissioner alleges that the Defendants were manufacturers and suppliers of the PCEs that caused the contamination of the Aquifer.

■ While manufacturers or suppliers of hazardous substances may be considered to be PRPs if they otherwise fall within one of the four categories of "covered persons" listed in Section 107 of CERCLA, the Court is unaware of any statutory or other authority holding that an entity may be liable under CERCLA based solely on the fact that it manufacturers or supplies such substances. To the contrary, "[i]t is clear that Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products." *Dayton Indep. School Dist. v. U.S. Mineral Prod. Co.*, 906 F.2d 1059, 1065 (5th Cir. 1990).

In *Burlington Northern and Santa Fe Ry. Co. v. United States*, ___ U.S. ___, 129 S. Ct. 1870, 173 L. Ed. 2d 812 (2009), the Supreme Court of the United States addressed the issue of whether a manufacturer of hazardous substances was a PRP under CERCLA. In that case, an agricultural chemical distributor (the "Distributor") conducted operations on a parcel of land in California. As part of its business, the Distributor purchased and stored various hazardous chemicals, including a chemical known as D-D, which it purchased from Shell Oil Company ("Shell"), the manufacturer of D-D. The California Department of Toxic Substances Control and the EPA (together, the "Governments") investigated the operations of the Distributor and discovered significant soil and ground water contamination. The Governments exercised their CERCLA authority to clean up the contamination. Thereafter, the Governments commenced an action under CERCLA for reimbursement of costs incurred in the

investigation and cleanup of the contaminated land.[7] Following a lengthy bench trial, the district court ruled in favor of the Governments, finding that Shell was liable under CERCLA because it "arranged for" the disposal of hazardous substances through its sale and delivery of D-D. *See* 42 U.S.C. § 9607(a)(3).

The United States Court of Appeals for the Ninth Circuit affirmed, reasoning that while Shell was not a traditional "arranger" under Section 9607(a)(3), it could nonetheless be liable under a " 'broader' category of arranger liability, in which disposal of hazardous wastes [wa]s a foreseeable byproduct of, but not the purpose of, the transaction giving rise to PRP status." *United States v. Burlington Northern and Santa Fe Ry. Co.*, 520 F.3d 918, 948 (9th Cir. 2008). Applying that test, the Ninth Circuit concluded that Shell had arranged for the disposal of a hazardous substance through its sale and delivery of D-D because

> Shell arranged for delivery of the substances to the site by its subcontractors; was aware of, and to some degree dictated, the transfer arrangements; knew that some leakage was likely in the transfer process; and provided advice and supervision concerning safe transfer and storage. Disposal of a hazardous substance was thus a necessary part of the sale and delivery process.

*Id.* at 950.

The Supreme Court disagreed. The Court explained that "[i]t is plain from the language of the statute that CERCLA liability would attach under [Section] 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." 129 S. Ct. at 1878. It further explained that "[i]t is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* However, the Court acknowledged that, in cases falling between those two extremes, the determination of whether a manufacturer qualifies as a PRP may be less clear. *See id.* at 1879. The

---

[7] The Governments' case was consolidated with an action brought by the railroads that owned the contaminated land for contribution against the facility's owner and operator. However, analysis of that case is not relevant for present purposes.

*Burlington* Court explained that, because CERCLA does not define the phrase "arrange for," it must be given its ordinary meaning. *See id.*

█ "In common parlance, the word 'arrange' implies action directed to a specific purpose." *Id.* Thus, the Supreme Court held that, "under the plain language of the statute, an entity may qualify as an arranger under [Section] 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.*

█ Accordingly, the Supreme Court rejected the Governments' argument that

> by including unintentional acts such as 'spilling' and 'leaking' in the definition of disposal,[8] Congress intended to impose liability on entities not only when they directly dispose of waste products but also when they engage in legitimate sales of hazardous substances knowing that some disposal may occur as a collateral consequence of the sale itself.

*Id.* at 1879-80. To that end, the Court explained that,

> [w]hile it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an arranger, Shell must have entered into the sale of D-D *with the intention* that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3).

*Id.* at 1880 (emphasis supplied). Ultimately, the *Burlington* Court found that Shell could not be held liable under CERCLA based on its status as the manufacturer of D-D and its mere knowledge that spills and leaks of D-D occurred.

---

[8] CERCLA defines the term "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water." 42 U.S.C. § 6903(3); *see also id.* at § 9601(29) (adopting the definition of "disposal" contained in the Solid Waste Disposal Act).

At the August 6, 2009, hearing in this matter, the parties all agreed that the Defendants are not "arrangers," as defined in *Burlington*. The parties also agreed that the Defendants do not fall within any of the other categories of PRPs under CERCLA. Because they are not "covered persons" under the statute, the Defendants are not subject to liability for cleanup costs, damages, or contribution under CERCLA. Thus, CERCLA does not create a federal cause of action vindicating the same interest that the Commissioner seeks to vindicate in Counts One through Five of the complaint in this matter.

Accordingly, the first prong of the complete preemption test is not satisfied with respect to Counts One through Five of the complaint, and the doctrine of complete preemption cannot provide a basis for this Court's jurisdiction over those counts.

### 2. Count Six

In Count Six, the Commissioner "seeks restitution of Defendants' wrongful profits, revenues, and benefits" "from defective products which caused environmental damages in the Territory." (Compl. 15-16, ¶¶ 91, 93.) Unlike the contribution and indemnity claim in Count Five, Count Six does not seek to hold the Defendants responsible for their share of the liability for the hazardous waste contamination. Rather, it seeks to prevent the unjust enrichment of the Defendants, who allegedly wrongfully profited from manufacturing products that contributed to hazardous waste contamination.

CERCLA does not provide for the recovery of profits or revenues earned by PRPs from the production and manufacturing of products containing hazardous waste. The first prong of the complete preemption test is therefore not satisfied. Accordingly, the doctrine of complete preemption does not provide a basis for federal question jurisdiction over the Commissioner's restitution claim asserted in Count Six.[9] *See, e.g., Coffey v. Freeport-McMoran Copper & Gold Inc.*, 623 F.

---

[9] It is unclear whether a Virgin Islands court has sustained, or even recognized a claim for "wrongful profits" as alleged in Count Six. Still, whether the Commissioner can actually recover under territorial law for the claims alleged in Count Six or any other count of the complaint presents a distinct question that is not properly before the Court. The Court's inquiry at this stage is jurisdictional, not merit based. Indeed, a state-law claim that is not completely preempted by federal law for jurisdictional purposes may nonetheless be dis-

Supp. 2d 1257, 1273-74 (W.D. Okla. 2009) (holding that CERCLA did not completely preempt the plaintiff's state-law claim for unjust enrichment); *People ex rel. Ryan v. Northbrook Sports Club*, 1999 U.S. Dist. LEXIS 18632, *13 (N.D. Ill. Nov. 24, 1999) (holding that CERCLA did not completely preempt the plaintiff's state-law restitution claim) (unpublished).

## B. Substantial Federal Question

Even if the doctrine of complete preemption does not give the Court jurisdiction over the Commissioner's claims, the Defendants argue that Counts Five and Six of the complaint nonetheless raise substantial and disputed questions of federal law under CERCLA sufficient to confer federal jurisdiction.[10]

 Under the substantial federal question doctrine, federal jurisdiction exists over a state-law claim where the state-law claim "necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983). It is not enough that the court may have to interpret federal laws or regulations. Rather, "the vindication of a right under state law [must] turn[] on some construction of federal law." *Merrell Dow Pharmaceuticals Inc. v.*

---

placed by federal law under other, non-jurisdictional species of preemption, which may be raised as affirmative defenses in any forum. *See generally Lazorko v. Pennsylvania Hosp.*, 237 F.3d 242, 248-49 (3d Cir. 2000) (contrasting the doctrine of complete preemption with "substantive preemption, which displaces state law but does not, as a defense, confer federal question jurisdiction"); *Johnson v. Baylor Univ.*, 214 F.3d 630, 632 (5th Cir.2000) (" 'Complete preemption,' which creates federal removal jurisdiction, differs from more common 'ordinary preemption' (also known as 'conflict preemption'), which does not."); *see also Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1486-87 (7th Cir. 1996) (explaining that the " 'complete preemption doctrine' is actually a misnomer because it is not a preemption doctrine but, rather, a federal jurisdiction doctrine").

[10] With respect to the natural resource damage claims alleged in Counts One through Four of the complaint, the Defendants initially claimed that those counts raised substantial federal questions because they sought damages in excess of the CERCLA damages awarded in the *In re Tutu Wells Contamination Litigation*. Thus, the Defendants claim that Counts One through Four are really challenges to the effectiveness of a CERCLA remediation. However, the Commissioner has stated that he "does not challenge nor question the federally approved cleanup nor wish to modify it. . . . [The Commissioner] does not seek damages related to the cost of cleaning up the site nor does [he] intend to take any action to interfere with the current cleanup." (Reply to Opp'n to Suggestion to Dismiss 2.)

*Thompson*, 478 U.S. 804, 808, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986). To determine whether a district court has federal question jurisdiction over a state-law claim, a three-part test applies. The court must inquire (1) whether the state-law claim necessarily raises a federal issue; (2) whether the federal issue is "actually disputed" and "substantial;" and (3) whether the exercise of federal jurisdiction would disturb "any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005).

The Court notes at the outset that there is a dearth of case law addressing the issue of whether state-law claims such as those alleged in Counts Five and Six of the complaint in this case raise a substantial federal question under CERCLA sufficient to confer federal question jurisdiction under the standard outlined in *Grable*.[11]

In *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005), the Supreme Court of the United States was confronted with this seminal jurisdictional question. In that case, the plaintiff, Grable & Sons Metal Products, Inc. ("Grable") owned real property that the Internal Revenue Service ("IRS") seized to satisfy a federal tax deficiency. *Id.* at 310. Grable received notice of the seizure by certified mail before the IRS sold the property to the defendant, Darue Engineering & Mfg. ("Darue"). *Id.* Five years later, Grable sued Darue in state court to quiet title. Grable asserted that Darue's record title was invalid because the IRS had conveyed the seizure notice improperly. *Id.* at 311. The governing statute, 26 U.S.C. § 6335(a) ("Section 6335(a)"), provides that "notice in writing shall be given . . . to the owner of the property . . . or shall be left at his usual place of abode or business . . . ." Grable maintained that Section 6335(a) required personal service, not service by certified mail. *Id.* Darue removed the case to district court, invoking jurisdiction under Section 1331 on the ground

---

[11] In *New Mexico v. General Elec. Co.*, 467 F.3d 1223 (10th Cir. 2006), the court, citing *Grable*, raised the issue of "whether CERCLA's involvement with the state law claims was sufficient to warrant the district court's independent exercise of federal jurisdiction." *Id.* at 1242 n.29. The court noted that "the effect which federal law, namely CERCLA, might have upon the scope of the State's [natural resource damages] claim . . . weighed in favor of retaining jurisdiction." *Id.* However, the court expressly declined to decide the issue because it found that jurisdiction was proper under 28 U.S.C. § 1367. *See id.*

that Grable's claim of title depended on the interpretation of Section 6335(a).

The Supreme Court affirmed the district court's conclusion that removal was proper. It found that the issue of whether Grable received notice adequate under Section 6335(a) was "an essential element of [Grable's] quiet title claim, and the meaning of the federal statute [wa]s actually in dispute[.]" *Id.* at 315. The Court further found that the meaning of the tax law was a substantial federal issue. The Court explained that the federal government had "a direct interest in the availability of a federal forum to vindicate its own administrative action and buyers (as well as tax delinquents) may find it valuable to come before judges used to federal tax matters." *Id.* Finally, the Court noted that "it is the rare state quiet title action that involves contested issues of federal law. Consequently, jurisdiction over actions like [Grable's] would not materially affect, or threaten to affect, the normal currents of litigation." *Id.* at 319. Accordingly, the *Grable* Court concluded that "there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of the state-law title claim." *Id.* at 320.

The Supreme Court revisited *Grable* in *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006). In *Empire,* the Supreme Court concluded that the action, which had originally been filed in district court, presented no substantial federal question under the well-pleaded complaint rule. In that case, a federally-funded health plan sued one of its members in district court, invoking jurisdiction pursuant to Section 1331. The plaintiff health plan sought to recover medical expenses it had paid when the defendant plan member received a settlement from a tort action in state court. *Id.* at 2128. The plan member moved to dismiss for lack of subject-matter jurisdiction, arguing that no federal question was present. *Id.* The district court dismissed the action. *Id.*

The Supreme Court affirmed that dismissal, holding that the case did "not fit within the special and small category" provided by *Grable. Id.* at 2136. The Court in *Empire* noted that, in contrast to *Grable*, which presented "a nearly pure issue of law[,] . . . . Empire's reimbursement claim . . . is fact-bound and situation-specific." *Id.* at 2137 (quotation omitted). The Court acknowledged that the government "has an overwhelming interest in attracting able workers to the federal workforce," and "in the health and welfare of the federal workers upon

whom it relies to carry out its functions." *Id.* However, it concluded that those interests "do not warrant turning into a discrete and costly 'federal case' an insurer's contract-derived claim to be reimbursed from the proceeds of a federal worker's state-court-initiated tort litigation." *Id.*

Here, the Defendants argue that Counts Five and Six of the Commissioner's complaint raise a substantial, disputed federal issue because the Commissioner seeks contribution, indemnity, and restitution in the same amount as the damages awarded against L'Henri in the consent judgment in the *In re Tutu Wells Contamination Litigation*, which was a CERCLA case. With respect to the restitution claim alleged in Count Six, the Court finds the Defendants' argument to be factually inaccurate. In Count Six, the Commissioner does not seek restitution in connection with any conduct related to the consent judgment in the *In re Tutu Wells Contamination Litigation*. Rather, as stated above, Count Six seeks to prevent the unjust enrichment of the Defendants, who allegedly wrongfully profited from manufacturing products that contributed to hazardous waste contamination.

The Defendant's argument that the contribution and indemnity claims asserted in Count Five present a substantial federal question is in essence a claim that the Commissioner is attempting, through the Assignment of the claims of L'Henri to the Commissioner, to hold the Defendants liable for a CERCLA judgment. In the Defendants' view, because Congress has provided a mechanism for apportioning clean-up costs among "covered persons" under CERCLA, the Court would have to look to CERCLA to determine whether it would be appropriate to apportion part of L'Henri's liability under the consent judgment to the Defendants in this case. However, as the Commissioner points out, the Assignment specifically excludes claims for "payment for the remedial investigation, claims for response costs and other costs related to the administrative action pending with the United States Environmental Protection Agency." (Assignment 1, ¶ 1, Feb. 2005.) Rather than seeking contribution or indemnity for any amounts paid in relation to CERCLA liability, the Commissioner stated at the August 6, 2009, hearing that he seeks only contribution and indemnity for ancillary, non-CERCLA payments, such as expenses L'Henri incurred in repairing roads that were damaged from overuse by water trucks.

■ Moreover, even if the Commissioner sought contribution or indemnity in connection with the CERCLA-related damages awarded against L'Henri in the *In re Tutu Wells Contmaination Litigation,* it does

not necessarily follow that such claim raises a substantial and disputed federal issue warranting federal jurisdiction under *Grable*. Indeed, in contrast to *Grable*, where the meaning of the federal statute at issue in *Grable* was the "only legal or factual issue contested in the case," *Grable*, 545 U.S. at 315, here, no such interpretation is necessary to decide the Commissioner's contribution and indemnity claims. While the Commissioner's right to relief on his claims may be limited by CERCLA,[12] the meaning of CERCLA's provisions has not been placed in active dispute by the Commissioner's complaint in this matter. Thus, while the Commissioner's territorial-law claims bear some relation to federal issues in the sense that those claims arise out of a federally-supervised contaminated site, they do not raise an actually-disputed and substantial issue concerning CERCLA.

Accordingly, the Court finds that there is no federal question upon which to base jurisdiction in this Court pursuant to Section 1331. *See, e.g., Goepel v. Nat'l Postal Mail Handlers Union*, 36 F.3d 306, 310 (3d Cir. 1994) (finding no federal question where the complaint merely alluded to a federal contract); *City Nat'l Bank v. Edmisten*, 681 F.2d 942, 945 (4th Cir. 1982) (finding no federal question where the plaintiff banks' challenge to North Carolina's application of usury laws, while incorporated into the National Bank Act, did not turn on a question of federal law); *Standage Ventures v. Arizona*, 499 F.2d 248, 250 (9th Cir. 1974) (deeming no federal question to exist where "the real substance of the controversy . . . turns entirely upon disputed questions of law and fact relating to compliance with state law, and not at all upon the meaning or effect of the federal statute itself").

## III. CONCLUSION

For the reasons stated above, this Court lacks jurisdiction to hear the claims raised in this matter. Consequently, this action will be dismissed. An appropriate Order follows.

---

[12] For instance, the Tenth Circuit has held that "CERCLA's comprehensive NRD scheme preempts any state remedy designed to achieve something other than the restoration, re-placement, or acquisition of the equivalent of a contaminated natural resource." *General Elec. Co.*, 467 F.3d at 1247. As such, "an unrestricted award of money damages-cannot with-stand CERCLA's comprehensive NRD scheme." *Id.* at 1248.